**Affirmed and Memorandum Opinion filed February 21, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00434-CV

## IN THE INTEREST OF Z.Q.N., A CHILD

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-14463**

## M E M O R A N D U M   O P I N I O N

Appellant L.B. (Lisa) gave birth to Zara and, as planned, relinquished her parental rights two days later so appellees Cindy and Alex Nunn could adopt the baby.[1] About six weeks after the Nunns filed suit to terminate Lisa's parental rights and adopt Zara, Lisa filed her own lawsuit against the Nunns, contending she revoked her relinquishment. The Nunns amended their petition to seek termination of Lisa's parental rights on involuntary grounds as well as relinquishment. After a bench trial, the trial court terminated the parent-child relationship between Lisa and

---

[1] We use pseudonyms or initials to refer to the child, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

Zara on both voluntary and involuntary grounds and granted the Nunns' petition for adoption.

Lisa raises five issues on appeal. She contends: (1) she revoked her affidavit of relinquishment, and her revocation deprived the trial court of jurisdiction; (2) the evidence is legally and factually insufficient to support involuntary termination; (3) the trial court erred in failing to order a medical history report; (4) Lisa received ineffective assistance of counsel; and (5) the trial court abused its discretion in excluding Lisa's "critical evidence" at trial. We affirm.

## BACKGROUND

The Nunns met Lisa through a mutual acquaintance when Lisa was about seven months pregnant. Lisa and the Nunns agreed they would adopt her baby. Cindy communicated with Lisa throughout the remainder of the pregnancy to ensure Lisa still wanted them to adopt her baby.

Zara was born on January 21. Lisa signed an affidavit of relinquishment of her parental rights 49 hours later. The affidavit stated it was irrevocable for 60 days.

The Nunns initiated an adoption proceeding in Fort Bend County when Zara was one week old, asking the trial court to terminate Lisa's parental rights and grant their petition to adopt Zara. The Nunns alleged two grounds for termination under section 161.001(b)(1) of the Texas Family Code: Lisa abandoned Zara (subsection (b)(1)(A)), and Lisa relinquished her parental rights (subsection (b)(1)(K)).

Though the revocation is not in the record, the parties appear to agree Lisa signed an affidavit revoking her relinquishment on March 2, within the 60-day period of irrevocability. On March 4, Lisa sued the Nunns in Harris County, seeking to be appointed Zara's sole managing conservator. That is the lawsuit from which this appeal arose. Lisa reportedly signed a second revocation in late March, after the

period of irrevocability expired. That revocation is not in the record, either. The Nunns' Fort Bend County suit is said to have been transferred to Harris County in April and consolidated with Lisa's suit, though the record does not contain an order of transfer or an order of consolidation.

The Nunns counterpetitioned in the consolidated case, again asking the court to terminate Lisa's parental rights and grant their petition to adopt Zara. This time, they added two grounds for termination in addition to abandonment and relinquishment: Lisa endangered Zara (subsection (b)(1)(E)), and Lisa abused drugs in a way that endangered Zara and either failed to complete a court-ordered treatment program or completed such a program but relapsed (subsection (b)(1)(P)).

**TRIAL**

Lisa represented herself at trial. The Nunns were represented by counsel, and Zara was represented by an attorney ad litem. Because we conclude the evidence is legally and factually sufficient to support termination on the ground of endangerment, our discussion focuses on that evidence, as well as evidence relevant to Zara's best interest.

### A.    Evidence about Lisa

### 1.    Before this lawsuit

***Before Zara.*** Lisa gave birth to her first child, a boy, in her late teens, just before she graduated high school. Her second son was born roughly two years later; her third child, a girl, two years after that. She completed training to be a certified nursing assistant; the record does not reflect whether she worked in that field.

Lisa worked as an exotic dancer after her oldest son was born and continued that work until sometime after giving birth to her daughter. She testified she is embarrassed of that work. While she was a dancer, Lisa admitted, she drank alcohol

3

and took drugs. Lisa's mother, Sally, testified Lisa smoked marijuana "off and on" but did not use "heavy drugs" and has never been an addict.

Lisa danced, clothed, in a music video she believes was made shortly before she became pregnant with Zara. She was paid for her work on the video. The video features marijuana and drug paraphernalia, though Lisa does not appear to use drugs in the video.

Lisa testified Child Protective Services (CPS) came to her house at least four or five times to investigate her. She alleged the reports were all made by the father of one of her sons in retaliation against her. She testified CPS found no evidence to support the reports.

***Pregnancy with Zara.*** Zara was conceived when Lisa was 23 years old. The pregnancy was unplanned. Already a mother to three children under the age of five, including an infant, Lisa felt distraught and overwhelmed at the prospect of caring for a fourth child. She vacillated about whether to terminate the pregnancy, place the baby for adoption, or keep the baby. After going to an appointment for an abortion and seeing the fetal heartbeat, Lisa decided to continue the pregnancy.

Lisa concealed the pregnancy from her family. Sally, who lives in the same house with Lisa, testified she never knew Lisa was pregnant because Lisa "hid it." Sally backtracked and acknowledged she knew Lisa was pregnant towards the end of the pregnancy, but she said Lisa told her the baby died. Sally believed Lisa was being forced to go along with a "plot," the purpose of which was to deceive her (Sally) into believing the baby died in utero so she would not know Lisa planned to place the baby for adoption.

Lisa testified she used drugs during her pregnancy with Zara "because [she] didn't know how to come out and tell [her] family that [she] had became [sic]

4

pregnant because I already had three kids." Medical records reflect she tested positive for marijuana in the beginning of her third trimester. The records also state Lisa contemporaneously denied any current use of marijuana. Lisa posted a photo of a drink to her Facebook page roughly six weeks before Zara was born. The caption to the photo was, "This drink mixed with patrón gave me life #SWEET#BITCH." Three weeks after that, Lisa denied current drug use at a check-up. She also denied past drug use, despite her recent positive result for marijuana and her admitted drug use in the beginning of her pregnancy with Zara.

The Nunns tried to stay involved in Lisa's life after she agreed to let them adopt her baby. They paid her cell phone bill to ensure they could be in contact with her until the baby was born. They offered to drive her to medical appointments; Lisa declined. They asked her to share medical information about her and the baby's health. Lisa reportedly told the Nunns she did not want to seek prenatal care because she did not want her family to find out she was pregnant. The following is an excerpt from a text message conversation in which Cindy requests and Lisa refuses to provide medical information:

> Cindy: I don't need to go to the doctor with you and be in the room and all that, but I will need for you to ask that the doctor share test results with us regarding both of you.

> Lisa: If y'all have questions for that day u can ask him for a print out of health issues the day I deliver. . . [ellipsis in original] I really feel like its go be some problems behind this since we not going through agency because my name is go be on birth certificate which I didn't want and I been talking to people and they been saying the people can look for me. . . [ellipsis in original] Maybe y'all need to do some homework because I'm doing my part

Sometime after that exchange, Cindy asked Lisa if she made it to her doctor's appointment. Lisa said she went to the appointment, where she had blood drawn and was prescribed prenatal pills.

Lisa told the Nunns she was due at the end of December. Two days past the reported due date, the Nunns took her to the hospital to be induced into labor. An ultrasound revealed Lisa was only 36 weeks pregnant. Based on that error, Cindy testified, she knew Lisa was still refusing regular prenatal medical care.

Two days before she gave birth to Zara, Lisa asked Cindy by text if the "papers" would be ready for her to sign at the hospital. Cindy told Lisa she had to wait 48 hours after birth to relinquish her parental rights. Lisa reiterated she wanted to sign the documents before she left the hospital.

*Zara's birth.* The Nunns attended Zara's birth. Lisa allowed them to choose the baby's first and middle names and give her their surname. Lisa testified she let the Nunns name her because "they were there at the hospital and I had them come up to the hospital and I felt like I strung them along, and I just really wasn't rolling with the punches at the time." Two days after Zara was born, Lisa signed (1) an affidavit authorizing the hospital to release Zara to the Nunns, and (2) an affidavit of voluntary relinquishment of her parental rights.

*Weeks following Zara's birth.* Lisa and Cindy talked on the phone after the Nunns filed their adoption suit in Fort Bend County. Recordings of two of their phone conversations were admitted into evidence. Throughout the calls, Lisa consistently stated it was her mother, not her, who wanted Zara back, and it was her mother, not her, who wanted to go to court to contest the adoption. "It's her," Lisa told Cindy. "It's nobody else but her." Lisa said her mother and other family members were treating her like a "monster" for giving away her baby. For her own part, Lisa told Cindy, "I never changed my mind. . . . I still haven't changed my mind. . . . I never planned on bringing a fourth child home."

### 2. During this lawsuit

*Drug use.* The record reflects drug use by Lisa after she petitioned for custody

of Zara in early March. She posted a photo of herself to Facebook on March 21 in which she is holding a partially-smoked marijuana cigarette. On April 20, she posted another photo of herself lying next to a table with what appears to be drug paraphernalia on it. She captioned the photo, "4/20 who ready?" Lisa tested positive for amphetamine, methamphetamine, cocaine, and marijuana on May 18.

Lisa posted videos of herself to Facebook, three of which were admitted into evidence. In a video made within a few months before trial, Lisa talks about "dealing with haters." Lisa flicks a lighter near the end of the short video and says sometimes "you gotta light a b**** up like the motherf***ing Fourth of July," then confirms she is "a motherf***ing lighter upper." Lisa appears to be under the influence of alcohol and/or drugs in the video.

Lisa underwent substance abuse rehabilitation twice, but the record does not reflect when she was in such treatment. She was an inpatient in the first one for about a week. She participated in the second one as an outpatient once a week for five or six weeks. She attended Alcoholics Anonymous and Narcotics Anonymous (AA/NA) meetings but stopped, believing them unnecessary because she is not a drug addict. She testified a drug counselor confirmed she does not have a drug problem.

***Visits with Zara.*** Cindy testified Lisa visited Zara 33 times and either was late for or did not appear at 11 visits. Cindy's friend supervised the visits in the beginning, then the visits were transferred to and supervised at a SAFE visitation center.[2] Lisa testified her failure to appear at the first SAFE visit resulted from a miscommunication about which SAFE location would host the visit. On another visit, SAFE personnel noted she was dressed inappropriately, but she borrowed a

---

[2] The SAFE acronym is not defined in the record.

sweater and proceeded with the visit. A SAFE monitor noted Lisa's other three children were disruptive during one visit; Cindy's friend testified to similar behavior in an earlier visit.

Other than those problems, the visits were successful. The SAFE monitors noted Lisa was loving, appropriate, and engaged with Zara during every visit. Lisa consistently brought snacks and toys for Zara. Zara was also said to be happy and comfortable with Lisa, particularly in the first few visits. She seemed to experience some separation anxiety in leaving Cindy as she got older.

***Stability and plans for Zara.*** After living with her mother throughout her pregnancy, Lisa shared a two-bedroom apartment with her three children at the time of trial. Sally testified the children spend the night at her own two-bedroom apartment approximately twice a week. She said her two grandsons sleep in one room and her granddaughter, then age two, sleeps with her.

One of the Facebook videos was filmed in the kitchen of an apartment; the record is not clear if the apartment belongs to Lisa or Sally. The portions of the apartment visible on the video are clean and well-appointed.

Lisa worked as a bartender at the time of trial. She had recently left her job at Macy's because she had to miss too much work due to court appearances for this case. She testified she receives three types of governmental assistance: food stamps for herself, WIC benefits for her children, and Medicaid for her children. Still, Lisa said, she felt financially stable and believed her family would help her with anything she needed.

## B.    Evidence about Zara and the Nunns

Cindy and Alex had been in a relationship for 15 years and married for nine at the time of trial. Cindy taught kindergarten, and Alex managed an auto parts store.

Both testified they do not use drugs. Cindy drinks alcohol perhaps four times per year; Alex has a drink once every month or two.

The Nunns considered themselves financially stable. They lived in a two-bedroom, two-and-a-half-bathroom townhouse. Alex testified they paid all of Zara's post-birth health care expenses out of pocket and through the health insurance policy he had through his job; he said Lisa did not tell him Medicaid benefits were available for Zara. Hoping to place Zara in private school, the Nunns were saving money for her lower and higher education. They testified they can afford to pay for child care and extracurricular activities and were looking into swimming and gymnastics classes for Zara.

Fourteen months old at trial, Zara was described as adventurous, fearless, playful, friendly, and happy. She was developing well and meeting all her milestones. Both Cindy and Alex commented on Zara's love of books and reading. Cindy's father takes care of Zara while the Nunns are at work.

Lisa and the Nunns introduced many photographs of Zara into evidence, both by herself and interacting with others. Zara appears happy in all of the photographs.

## C. Trial court's findings

The trial court found Lisa engaged in the conduct described in Family Code section 161.001(b)(1) subsections A (abandonment), E (endangerment), and K (relinquishment). The court further found termination of Lisa's parental rights was in Zara's best interest. Based on those findings, the court terminated the parent-child relationship between Lisa and Zara and granted the Nunns' petition for adoption.

## ANALYSIS

## I. Trial court's jurisdiction

In her first issue, Lisa contends her revocation of her relinquishment of

parental rights deprived the trial court of jurisdiction to terminate her parental rights on any ground, voluntary or involuntary. Lisa did not raise this argument in the trial court. Ordinarily, a party may not complain on appeal of an issue she did not raise in the trial court. Tex. R. App. P. 33.1(a). However, a trial court's subject matter jurisdiction is an issue that cannot be waived, and it may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). As stated, neither alleged revocation is in the appellate record or appears to have been offered at trial. Because we conclude the trial court had jurisdiction irrespective of Lisa's revocation, we assume for this discussion Lisa properly revoked her relinquishment.

Lisa relies on *In re McAda*, 780 S.W.2d 307 (Tex. App.—Amarillo 1989, writ denied). In *McAda*, the mother/appellant sought to place her baby for adoption. To that end, she relinquished her parental rights via an affidavit that stated it was irrevocable for 60 days. *Id.* at 309. She executed and filed an affidavit revoking her relinquishment during the 60-day period of irrevocability. *Id.* On the 60th day of that period, the trial court orally terminated the mother's parental rights. The mother executed and filed a second affidavit of revocation four days later. *Id.* Two days after that, the trial court signed and filed a written decree of termination. *Id.* On appeal, the mother contended her second revocation, made after the 60-day period of irrevocability expired and before the trial court signed the decree, operated to deprive the trial court of jurisdiction. *Id.* at 311–12. The court of appeals agreed an effective revocation would implicate the trial court's jurisdiction, writing, "The issue of parental consent contained in the affidavit of relinquishment in a voluntary adoption proceeding goes to the jurisdiction of the court. Without such consent, the court's only proper action is to dismiss the cause." *Id.* at 312 (citing *Hendricks v. Curry*, 401 S.W.2d 796, 802 (Tex. 1966)). However, the court of appeals concluded

10

the mother's revocation was not effective. *Id.* Revocation would be effective only if it was executed after the expiration of the period of irrevocability but before the mother's rights were terminated. Her first revocation was not effective because it was executed during the period of irrevocability. Her second revocation was not effective because it was executed after the trial court's oral rendition of judgment, which is the relevant rendition in a termination proceeding. *Id.*

Like *McAda*, Lisa allegedly executed two affidavits of revocation, the first during the period of irrevocability and the second after. Like *McAda*, Lisa's first revocation was not effective. Unlike *McAda*, though, Lisa's parental rights had not been terminated at the time of the second revocation. If relinquishment was the only basis for termination of Lisa's rights, *McAda* would suggest the trial court lacked jurisdiction once Lisa revoked her relinquishment.

But relinquishment was not the only basis for termination of Lisa's parental rights. In their original petition, the Nunns sought termination based both on Lisa's relinquishment and on her alleged abandonment of Zara, a ground for involuntary termination. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A). For that reason, this case is more like *Swinney v. Mosher*, 830 S.W.2d 187 (Tex. App.—Fort Worth 1992, writ denied). In that case, Swinney signed an affidavit of relinquishment the day after giving birth to her daughter. Like the affidavits of relinquishment in this case and in *McAda*, Swinney's affidavit was irrevocable for 60 days. *See id.* at 190. The next day, day one of the period of irrevocability, Swinney told the prospective adoptive parents, the Moshers, she had changed her mind and wanted her baby back. *Id.* The Moshers filed a petition for adoption the day after that. *Id.* An attorney ad litem was appointed to represent the baby's interests, and on day 51 of the 60-day period, he filed a petition for termination alleging Swinney's abandonment of the baby as a basis for involuntary termination of her parental rights. *Id.* at 190, 196. Swinney

11

executed and filed an affidavit of revocation the first business day after the period of irrevocability expired. *Id.* at 190. Sometime after Swinney executed her revocation, the Moshers amended their petition to seek termination on the ground of abandonment as well as relinquishment. *See id.* at 196. On appeal, Swinney asserted her revocation deprived the trial court of subject matter jurisdiction because it was executed before the Moshers petitioned for termination on an involuntary ground. *See id.* The court of appeals rejected her assertion, concluding the attorney ad litem's petition for termination based on abandonment was sufficient to preserve the trial court's jurisdiction despite Swinney's revocation. *See id.* In this case, the Nunns petitioned for termination based on relinquishment and abandonment before Lisa revoked her relinquishment. Just as in *Swinney*, their request for termination on that ground preserved the trial court's jurisdiction.

We overrule Lisa's first issue.

## II. Termination

We next consider Lisa's second issue, in which she contends the evidence is legally and factually insufficient to support the trial court's findings that she abandoned and endangered Zara and that termination of her parental rights is in Zara's best interest.

### A. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights can be terminated if clear and convincing evidence shows

12

(1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

### B. Predicate ground for termination: Endangerment

#### 1. Legal standards

Family Code section 161.001(b)(1)(E) requires clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

A finding of endangerment requires evidence the endangerment resulted from the parent's conduct, including acts, omissions, or failures to act. *S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

## 2.    Application

***Drug use.*** A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

A mother's use of drugs during pregnancy may be conduct that endangers the child. *In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). However, termination is not automatic in such a case. *See A.S.*, 261 S.W.3d at 86 ("While unquestionably, an exercise of poor judgment, Veronica's use of marijuana on a single occasion, standing alone, does not rise to the level of a conscious course of conduct.").

Taken in the light most favorable to the endangerment finding, the evidence shows Lisa used drugs before, during, and after her pregnancy with Zara. She testified she used drugs while she worked as an exotic dancer. She said she took drugs while she was pregnant with Zara because she did not know how to tell her family she was pregnant. Though she denied drug use at a doctor's visit in her third trimester, she tested positive for marijuana. A photo she posted to Facebook a few weeks later, while she was still pregnant, suggests she drank alcohol. At another doctor's appointment towards the end of her pregnancy, she again denied current and past drug use, despite her recent positive drug test result. She stopped attending

AA/NA meetings because, as she maintained at trial, she believed did not have a drug problem and was not an addict. A parent's unwillingness to admit she has a substance abuse problem suggests she will continue to abuse drugs and therefore continue to endanger her children. *See In re A.J.E.M.-B.*, Nos. 14-14-00424-CV, 14-14-00444-CV, 2014 WL 5795484, at *5 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) (considering evidence that parents "minimized concerns and were in denial of the impact that substance use has on their ability to sufficiently be in tune to the needs of their child"); *In re E.H.*, No. 02-09-00134-CV, 2010 WL 520774, at *4–*5 (Tex. App.—Fort Worth Feb. 11, 2010, no pet.) (mem. op.) (considering father's denial that his drug use and drug dealing harmed his children as factor in endangerment analysis).

Shortly after she petitioned for custody of Zara, Lisa posted photos of herself to Facebook consistent with drug use. Two months after that, Lisa tested positive for amphetamine, methamphetamine, cocaine, and marijuana. Lisa posted a video of herself not long before trial in which she appears to be under the influence of alcohol and/or drugs, announcing sometimes "you gotta light a b**** up like the motherf***ing Fourth of July." A parent's continued drug use when the custody of her child is in jeopardy supports a finding of endangerment. *See S.R.*, 452 S.W.3d at 361–62; *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

***Unwillingness to seek prenatal medical care.*** A mother's failure to seek prenatal care is relevant to the endangerment analysis. *See C.H. v. Tex. Dep't of Family & Protective Servs.*, 389 S.W.3d 534, 540–41 (Tex. App.—El Paso 2012, no pet.). Taken in the light most favorable to the endangerment finding, the evidence shows Lisa refused to seek prenatal care or to share prenatal medical information about Zara with the Nunns. Even after the Nunns offered to drive her to medical

16

appointments, Lisa declined. As a result of her irregular prenatal care, Lisa believed Zara was due three to four weeks before her true due date. The Nunns did not learn the real due date until Lisa underwent an ultrasound two days past her reported due date that revealed she was only 36 weeks pregnant.

### 3. Conclusion on endangerment

Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that Lisa engaged in conduct described in subsection E of section 161.001(b)(1) of the Family Code. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that Lisa endangered Zara. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding regarding subsection E. Because the evidence is sufficient to support the trial court's finding under subsection E, we do not consider the trial court's findings under subsections A or K. *A.V.*, 113 S.W.3d at 362.

### C. Best interest

#### 1. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment*, id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in its best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

### 2. Application

#### a. Zara

***Desires.*** When a child is too young to express her desires, the fact finder may consider that the child has bonded with the caregivers, is well cared for by them, and has spent minimal time with a parent. *L.G.R.*, 498 S.W.3d at 205; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Fourteen months old at the time of trial, Zara could not express her desires. The evidence is undisputed that Zara had bonded with the Nunns and was well cared for by them. The Nunns took Zara home from the hospital as a newborn, and Zara has never lived with Lisa.

18

***Needs.*** The Nunns testified Zara has no needs atypical for a child her age. They both testified they were meeting all her needs. As of the time of trial, Zara did not appear to show any adverse effects from Lisa's use of drugs and alcohol during pregnancy. Both Lisa and the Nunns testified they were prepared to address any such effects in the future.

***Dangers.*** Aside from Lisa's continued drug use, discussed above, no evidence suggests Zara will be in danger with either Lisa or the Nunns.

### b. Lisa

***Predicate grounds under Family Code section 161.001(b)(1).*** Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the children's best interest. *See C.H.*, 89 S.W.3d at 27. Accordingly, the evidence regarding endangerment under subsection E, discussed above, is relevant to the best-interest analysis.

***Willingness and ability to parent.*** Lisa elected not to terminate her pregnancy but to carry the baby to term. She decided it would be best to place the baby for adoption. During a phone conversation with Cindy after Zara was born, Lisa said she never intended to bring a fourth baby home. She insisted it was her mother, not her, who wanted to contest the adoption. While this case was pending, Lisa visited Zara regularly. She testified she wants to be Zara's parent.

***Programs available.*** Lisa testified her three older children receive WIC and Medicaid benefits. No evidence suggests Zara would not also qualify to receive those benefits if she were in Lisa's care.

***Stability of proposed placement.*** At the time of trial, Lisa and her children lived in a two-bedroom, one-bathroom apartment. The children reportedly spent the night with their grandmother approximately twice a week. The video Lisa posted

from a kitchen, either hers or Sally's, showed the kitchen and other portions of the apartment to be clean, furnished, and well-appointed.

***Acts and omissions and any excuses for them.*** In addition to the evidence regarding Lisa's drug use, Lisa admitted CPS investigated her four or five times. She said the allegations against her were retaliatory and meritless.

### c. The Nunns

***Willingness and ability to parent.*** The Nunns have never wavered in their desire to be Zara's parents. The evidence shows Zara was developing well under their care.

***Programs available.*** No evidence was offered regarding the Nunns' use of or need for programs to assist them with Zara.

***Stability of proposed placement.*** The Nunns lived in a two-bedroom, two-and-a-half-bathroom townhouse. Photos in evidence reveal the townhouse to have sufficient space for Zara to play and sleep as she grows. Cindy and Alex both worked outside the home. Cindy's father took care of Zara while the Nunns were at work. The Nunns both testified they are financially stable as a family and able to provide Zara with anything she needs.

***Acts and omissions and any excuses for them.*** There is no evidence of acts or omissions by the Nunns to indicate a parent-child relationship between them and Zara is not appropriate.

### 3. Conclusion on best interest

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Lisa's parental rights was in Zara's best interest. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Further,

in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination was in Zara's best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's best-interest finding.

We overrule Lisa's second issue.

## III. Medical report

In her third issue, Lisa contends we should reverse and remand because the trial court failed to order a medical history report as required by section 161.1031(a) of the Family Code. Section 161.1031(a) states:

> A parent who signs an affidavit of voluntary relinquishment of parental rights under Section 161.103 regarding a biological child must also prepare a medical history report that addresses the medical history of the parent and the parent's ancestors.

Tex. Fam. Code Ann. § 161.1031(a). The purpose of section 161.1031(a) is "to ensure that such medical history information is made available to persons, including adoptive parents, who have responsibility for, or a direct interest in, the health or welfare of the child . . . ." Bill Analysis, Tex. H.B. 1999, 79th Leg., R.S. (2013). Lisa also cites section 162.008(b), which provides in relevant part:

> A petition for adoption may not be granted until the following documents have been filed: (1) a copy of the health, social, educational, and genetic history report signed by the child's adoptive parents; . . . .

Tex. Fam. Code Ann. § 162.008.

We reject Lisa's contention for several reasons. First, it appears she has not preserved this issue for review. The record contains no indication that she brought the lack of a medical report to the trial court's attention and obtained a ruling on her objection. *See* Tex. R. App. P. 33.1(a). Second, in their petition for termination and

adoption, the Nunns, who are the beneficiaries of the medical history report, expressly waived the preparation of the report. Finally, "[t]he validity of a final adoption order is not subject to attack because a health, social, educational, and genetic history was not filed." Tex. Fam. Code Ann. § 162.012(b).

We overrule Lisa's third issue.

## IV. Ineffective assistance of counsel

Lisa asserts in her fourth issue that she received ineffective assistance of counsel. She identifies three alleged deficiencies in her lawyer's representation: (1) failing to submit Lisa's affidavits revoking her relinquishment of her parental rights to Zara; (2) moving to transfer venue of the Nunns' Fort Bend County suit to Harris County instead of moving to dismiss that suit; and (3) withdrawing "right before trial."

Indigent parents in state-initiated parental-termination proceedings enjoy the statutory right to appointed counsel in Texas. Tex. Fam. Code Ann. § 107.013(a). The right to counsel "embodies the right to effective counsel." *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).

This parental-termination case was not initiated by the state. It was initiated by the Nunns, who are private actors. A parent in a private termination proceeding does not have a right to appointed counsel. *In re J.C.*, 250 S.W.3d 486, 489 (Tex. App.—Fort Worth 2008, pet. denied).

We overrule Lisa's fourth issue.

## V. Admission of evidence

Finally, Lisa contends the trial court abused its discretion by excluding "critical evidence" she offered. She describes the excluded exhibits as "evidence to prove she was fit to be a mother," including proof of employment and her children's

school records. She also complains the trial court did not admit the affidavits revoking her relinquishment of parental rights.

A party seeking admission of evidence must inform the court of the substance of the evidence by an offer of proof, unless the substance is apparent from the context. Tex. R. Evid. 103(a)(2); *Jones v. Mattress Firm Holding Corp.*, 558 S.W.3d 732, 736 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Making an offer of proof enables an appellate court to determine whether the exclusion of the evidence was erroneous and harmful, and it allows the trial court to reconsider its ruling in light of the actual evidence. *Jones*, 558 S.W.3d at 736. The rules of evidence do not mandate a formal offer; they require only a "short, factual recitation of what the [evidence] would show" to preserve the issue for appeal. *In re N.R.C.*, 94 S.W.3d 799, 806 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

The court excluded Lisa's exhibits 9, 10, 13, 14, 15, 16, and 19. Lisa did not make an offer of proof of what those exhibits were. Assuming the "critical evidence" she cites on appeal is one or more of those exhibits, we lack sufficient information to consider whether the trial court abused its discretion in excluding them.

We overrule Lisa's fifth issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/    Tracy Christopher
        Justice

Panel consists of Justices Christopher, Hassan, and Poissant.